UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

PENN-DANIELS, LLC.,                )
                                   )
        Plaintiff,                )
                                   )
v.                                 )   Case No. 07-1282
                                   )
WILLIAM D. DANIELS, NANCY JANE     )
DANIELS, AND DAVID P. DANIELS,     )
                                   )
        Defendants.               )

## O R D E R

This matter is before the Court on Plaintiff's Motion for Summary Judgment. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [#23] is DENIED. The Court directs that judgment as a matter of law be entered in favor of Defendants as to Plaintiff's Complaint and that Defendants' counterclaim for breach of contract be dismissed without prejudice as premature.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

### BACKGROUND

Plaintiff, Penn-Daniels, LLC, ("P-D") is a Delaware limited liability company and successor in interest to Penn-Daniels Incorporated, a Delaware corporation. Defendants William D. Daniels, Nancy Jane Daniels, and David P. Daniels (collectively referred to as the "Daniels") own the property located at 888 S. Lake Storey Road, Galesburg, Illinois (the

"Property"). William Daniels is the agent and manager of the Property. In 1997, ShopKo acquired P-D from Defendants, and since then, P-D has been a subsidiary of ShopKo.

On December 18, 1997, P-D and the Daniels entered into an Amended and Restated Lease Agreement (the "Lease"), pursuant to which P-D leased the Property from the Daniels. Section 7 of the Lease provides in relevant part:

> Tenant agrees that during the term of this Restated Lease Tenant will, at its own expense, (i) keep the Project in as reasonably safe condition as its operations shall permit and (ii) keep all buildings and other improvements forming a part of the Project in good repair and in good operating condition, making from time to time all necessary repairs thereto and renewals and replacements thereof. . . .

The procedure for giving notice of an event of default by P-D as a result of a failure to fulfill any condition of the Lease is set forth in Section 13. Section 22 of the Lease grants P-D the right to exercise an option to purchase the Property.

> Unless there is then existing an uncured event of default by Tenant, in which case, Tenant shall have no right or option to purchase the Project as described herein, on . . . January 1, 2007 . . . or at the end of the Term of this Restated Lease, Tenant shall have the option to purchase from Landlords the Project herein demised, with the purchase price thereof to be the fair market value of the Project's real estate, buildings and improvements thereon . . . The option on the part of the Tenant shall be exercised by the Tenant giving Landlords written notice of the exercise of such option within thirty (30) days of the applicable January 1 or the terminating event, as the case may be. . . .

P-D has not operated a store on the premises of the Property since 2001. During 2005, P-D advised the Daniels that it was interested in exercising its purchase option during the course of negotiations attempting to obtain an early exit from the Lease.

In June 2005, William Daniels visited the Property with a consultant to inspect the Property and obtain an independent opinion regarding the cost of deferred maintenance

that needed to be performed. At that time, William Daniels claims that he observed conditions such as weeds and cracks in the parking lot of the Property. William Daniels then received a letter dated June 23, 2005, from his consultant outlining areas that needed to be fixed or maintained. Although the Daniels contend that they repeatedly complained to representatives of P-D and requested that they take remedial action on these areas between June 2005 and November 2006, they did not send any default notice under the terms of the Lease and continued to accept rent for the Property.

On November 16, 2006, the Daniels sent P-D a letter advising of conditions that they believed to constitute a default under the terms of the Lease. The conditions identified in this letter were the same conditions set forth in the June 2005 letter from the consultant and which William Daniels had personally observed in June 2005. The November 2006 letter was the only written notice of default that the Daniels ever sent to P-D in accordance with Section 13 of the Lease.

P-D contends that it gave notice to the Daniels of its intent to purchase the Property by letters dated November 28, 2006, and January 3, 2007. The Daniels counter that these notices were sent by ShopKo indicating its intent to exercise P-D's option to purchase under the Lease, but that ShopKo was not the "Tenant" as defined by the Lease and could not exercise the option. On January 10, 2007, the Daniels sent a letter to P-D asserting that it was in default under the terms of the Lease. William Daniels stated in his deposition that he sent the November 2006 letter in the form that he did with the knowledge that if the tenant didn't address those issues, it would be prevented from exercising its purchase option. (Daniels Dep. at 143)

On October 17, 2007, P-D filed this Complaint, seeking specific performance of the contract under the Lease and damages. The Daniels have counterclaimed for breach of contract. P-D has now moved for summary judgment. The matter is fully briefed, and this Order follows.

**DISCUSSION**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.

1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

I.  Defendants' Counterclaim

P-D first moves for summary judgment on the Daniels' counterclaim for breach of contract based on testimony by William Daniels that Defendants have not been damaged by P-D's failure to maintain the property.

> Q: Do you believe you've been damaged by what you believe to be Penn-Daniels' failure to maintain the property in accordance with what you believe the standard should be?
>
> A: At this point in time, no.
>
> Q: At some point in time in the future do you expect that you will be damaged?
>
> A: Could be.
>
> Q: How could you be?
>
> A: If – if nothing is done and the state of disrepair continues through the term of the lease, at the end of the lease when I get the property and we get the property back, we'll be faced with a large repair bill.
>
> Q: Do you have any idea of what that repair bill will be?
>
> A: It could be a lot bigger than what the estimates are now.

(William Daniels Dep. at 187-88)

In order to maintain a breach of contract claim under Illinois law, the claimant must demonstrate: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; a breach by the defendant; and (4) resultant damages." TAS Dist. Co. Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 631 (7th Cir. 2007);W.W. Vincent

& Co. v. First Colony Life Ins. Co., 351 Ill.App.3d 752, 814 N.E.2d 960, 967 (1st Dist. 2004). The plaintiff bears the burden of showing that he/she sustained damages, and "merely showing that a contract has been breached without demonstrating actual damages does not suffice, under Illinois law, to state a claim for breach of contract." Id., *citing* Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp., 255 F.3d 397, 401 (7th Cir. 2001). A claim that future damages will be incurred is likewise insufficient. Id., at 632-33. Based on William Daniels' testimony, P-D argues that the Daniels' cannot satisfy the damages requirement of their breach of contract claim.

The Daniels respond that they "will realize actual damage to the Property when the Lease term ends and the Property is returned, or if this Court grants P-D's request and allows it to exercise its option at a diminished fair market value." (Response at 21) The Daniels then point to estimates that they have received from their consultants as to what they believe to be the current amount of damage to the Property in terms of necessary repair work. They cite a September 29, 2008, letter from Architechnics, Inc., identifying $376,675.00 in repairs and maintenance that they believe will be necessary, as well as an October 2, 2008, letter from Carl A. Nelson & Co., listing $441,794.48 in repair costs that would be needed. The record is devoid of any evidence suggesting that Defendants have begun making any of the identified repairs or that any of these costs have actually been incurred. Rather, the record clearly establishes that the Daniels have shown nothing but future damages that may be incurred either if the Lease ends without P-D having made the repairs or if P-D is permitted to purchase the Property at a price that has been reduced because of the condition of the property.

It is therefore clear that under Illinois law, the Daniels have failed to meet their burden of showing that they have incurred actual damage at this time. Accordingly, their counterclaim would appear to be premature and will be dismissed without prejudice to filing a suit to bring the claim if and when they have suffered actual damages.

II.     Specific Performance

P-D next asks the Court to order specific performance under the Lease, namely that the Daniels be compelled to accept and honor P-D's attempt to exercise its purchase option pursuant to § 22 of the Lease. It is undisputed that P-D's right to exercise its purchase option is contingent on there being no existing uncured "event of default" at the time that P-D had to exercise its option by providing written notice to the Daniels within 30 days of January 1, 2007. Section 13 of the Lease defines what constitutes an "event of default" by P-D. The pertinent portion of this section for purposes of this suit is § 13(b), which provides in relevant part:

> Failure by Tenant to observe and perform any covenant, condition or agreement in this Restated Lease on the part of Tenant to be observed or performed, other than as referred to in Subsection (a) of this Section, for a period of thirty (30) days after written notice specifying such failure and requesting that it be remedied, given to Tenant by Landlords . . . .

Initially, the Court would observe that P-D's November 28, 2006, written notice was not within 30 days of January 1, 2007, as required in § 22. Even accepting P-D's assertion that the notice was received at the latest on December 1, 2006, it was still not within the 30-day window, as there are 31 days in the month of December, and 30 days prior to January 1, 2007, was therefore December 2, 2006. Thus, the Court must conclude that P-D's November 28, 2006, attempt to invoke its purchase option was untimely under the plain language of the contract.

P-D sent a second notice of intent to exercise its purchase option on January 3, 2007. Apparently construing the language "within thirty (30) days" to run either before or after January 1, 2007, the Daniels concede that this second attempt to give notice was timely. However, they argue that the notice was nevertheless deficient because it was not sent by P-D or any agent thereof.

The January 3, 2007, letter was sent by Peter G. Vandenhouten ("Vandenhouten"), ShopKo's Vice President and General Counsel. The letter states, "I am writing regarding the exercise of ShopKo's Option to Purchase set forth in the above Lease, which we exercised by letter dated November 28, 2006." The Daniels object to the sufficiency of this notice because § 22 of the Lease gives the purchase option to the "Tenant" and requires this option to be exercised by the "Tenant" giving written notice to the Landlord within 30 days of the applicable January 1. The Lease further defines the "Tenant" as "Penn-Daniels, Incorporated, a Delaware corporation." Accordingly, the Daniels maintain that P-D failed to exercise its right, and ShopKo had no right to exercise.

P-D responds that the letter expressly states that it was sent "on behalf of Penn-Daniels." This may be true with respect to the untimely November 28, 2006, notice stating that "pursuant to Section 22 of the Lease, Penn-Daniels, LLC, successor in interest to Penn-Daniels, Incorporated, hereby gives notice of its intent to exercise the option to purchase the Property on January 1, 2007." However, any such language is conspicuously absent from the January 3, 2007, notice which purported to exercise "ShopKo's Option to Purchase."

That being said, P-D has introduced evidence indicating that Vandenhouten is an employee and officer of ShopKo, which is the sole member of Penn-Daniels, LLC.

- 8 -

Furthermore, under the P-D Limited Liability Company operating agreement that became effective on December 23, 2005, ShopKo was the Managing Member and expressly charged with managing the business and affairs of P-D. P-D Limited Liability Company Agreement at § 6.1(a). The agreement gave ShopKo "all such powers and rights conferred on it by the [Delaware Limited Liability Company] Act with respect to the management and control of the Company." Id. Section 6.1(b) then authorizes ShopKo to delegate its "rights and powers to manage and control the business and affairs of the Company, including to delegate to agents and employees of a Member or the Company (including Officers), and to delegate by a written agreement with, or otherwise to, other Persons." Vandenhouten testified in his deposition that the operating agreement authorized officers to act on behalf of P-D, and he was an officer of both ShopKo and P-D. (Vandehnouten Dep. at 10-11; Vandenhouten Affidavit at ¶¶ 1-2) As the Daniels have offered no evidence to the contrary, they have failed to raise a genuine issue of material fact with respect to Vandenhouten's authority to act on behalf of P-D in exercising the purchase option under the Lease.

The Daniels next contend that P-D's attempt to exercise its purchase option was ineffective, as P-D was not in compliance with the Lease as a result of its failure to keep the property in good condition and repair. Although discovered as early as June 2005, the Daniels gave notice of the alleged default to P-D pursuant to the procedures set forth in the Lease on November 16, 2006. It is undisputed that the alleged default remained unremediated for more than 30 days after the notice, thereby becoming an uncured "event of default" under § 13 of the Lease. This uncured "event of default" was clearly in existence at the time that P-D issued its only timely attempt to exercise its purchase option on January 3, 2007. Thus, P-D would have had no right or option to purchase the Property

under the plain language of § 22 of the Lease unless the Daniels were somehow precluded from invoking the breach.

P-D takes issue with the fact that the Daniels were aware of the alleged deficiencies in the maintenance of the property as early as June 2005, yet took no action to notify P-D of the claimed deficiency until shortly before it was able to exercise its purchase option and continued to collect monthly rent payments. P-D asserts that this delay demonstrates a deliberate attempt by the Daniels to defeat P-D's ability to exercise its purchase option. In support of this argument, P-D cites <u>The Wolfram Partnership, Ltd. v. LaSalle National Bank, et al.</u>, 765 N.E.2d 1012, 1026-27 (Ill.App.Ct. 2001), and <u>Okey, Inc. v. American National Bank and Trust Co.</u>, 422 N.E.2d 221, 223 (Ill.App.Ct. 1981), for the proposition that the continued acceptance of rent following a breach constitutes a waiver of the breach and prevents the landlord from asserting a default on those grounds.

As there was clearly no express waiver in this case, any waiver would have to be implied from the conduct, actions, or words of the Daniels. <u>Id.</u>

> An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it. . . . Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive.

<u>Id.</u>

The Daniels respond that acceptance of rent has only been held to constitute waiver where such acceptance is inconsistent with the breach. Their continued communication of their concerns and requests to repair the Property to representatives of P-D on numerous occasions evidences their lack of acquiescence to P-D's failure to maintain the property and expectation that P-D would take action to correct the deficiencies during the

term of the Lease.  The fact that these informal requests were not the procedure set forth by the terms of the Lease to notify of a formal default does not mean that the efforts were meaningless, but merely that the event of default was not triggered until the issuance of the November 16, 2006, written notice.  The Daniels further assert that the Lease provided P-D with an opportunity to cure the default and still properly exercise its purchase option, but it chose not to do so.  Accordingly, the Court cannot find on this record that the Daniels' conduct sufficiently evidences an intention to waive a right or that their conduct is inconsistent with an expectation that P-D's compliance with its contractual obligations would be required.  Nor can the Court find that the Daniels' acceptance of rent payments constitutes an action inconsistent with the breach that would support a finding of waiver on the part of the Daniels.

Furthermore, § 14 of the Lease sets forth the Daniels' remedies in the event of default by P-D, which include: (a) declaring all rent immediately payable and terminating the Lease; (b) terminating the Lease and excluding the Tenant from possession after 30 days written notice; (c) excluding the Tenant from possession after five days written notice and attempting to lease the Property to another tenant; (d) take whatever action at law or in equity may appear necessary to collect the rent and any other amounts payable by Tenant to enforce performance and observance of any obligation under the Lease; and (e) the collection of an amount equal to all unpaid installments of rent and other payments due after the termination of the Lease.

> No remedy herein conferred upon or reserved to Landlords is intended to be exclusive of any other available remedy or remedies, but each and every remedy shall be cumulative and shall be in addition to every other remedy given under this Restated Lease or now or hereafter existing at law, in equity or by statute.

(Lease at § 14)  Section 14 also specifically states, "No delay or omission to exercise any right or power accruing upon any default shall impair such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient."  This contractual provision is also fatal to P-D's waiver argument.

P-D then suggests that the delay in issuing the notice of default violated the Daniels' implied duty of good faith and fair dealing by laying in wait to deliberately interfere with P-D's option to purchase the Property.[1]  "Every contract contains an implied promise of good faith and fair dealing between the contracting parties."  <u>Cromeens, Holloman, Sibert, Inc. v. AB Volvo</u>, 349 F.3d 376, 395 (7th Cir. 2003), *citing* <u>Northern Trust Co. v. VIII South Michigan Assoc.</u>, 657 N.E.2d 1095, 1104 (1st Dist. 1995).  However, the duty of good faith and fair dealing is used as a tool of contract interpretation to determine the parties' intent where contract language is ambiguous.  <u>Id.</u>  This is not such a case, as the contract language agreed to by both the Daniels and P-D expressly states that delay in exercising any rights accruing upon default "shall not be construed to be a waiver thereof."  Under Illinois law, the parties to a contract "are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." <u>Id.</u>  Accordingly, P-D's argument in this respect must also fail, and P-D has failed to show

---

[1] The Court notes for the record that P-D has not produced any evidence contradicting the assessments of the condition of the Property by the Daniels' consultants or otherwise established that they were not in violation of their obligation under § 7 of the Lease to keep the Property " in good repair and in good operating condition, making from time to time all necessary repairs thereto . . . ."  Nor has P-D attempted to show that it made any efforts to comply with this obligation despite the Daniels' requests or that it would not have been allowed to exercise its purchase option had it done so.

that the Daniels were precluded from invoking the breach, thereby eliminating P-D's opportunity to exercise its purchase option.

P-D criticizes the Daniels' failure to provide it with the repair estimates obtained in 2005. However, there is nothing in the contract that requires the Daniels to immediately declare a formal event of default or precludes them from informally encouraging representatives of the tenant to take action to remedy the situation. Moreover, once the Daniels did declare a formal event of default, P-D took no action to remedy the default but rather attempted to avoid its obligations by purchasing the Property at what would undoubtedly have been a lower price reflective of its lack of maintenance/need for repair. Had P-D simply taken action to remedy the alleged default, it could then have properly exercised its purchase option without any need to resort to litigation, but it chose not to do so and cannot now complain that the Daniels are enforcing their rights under the Lease.

On the record before the Court, no reasonable jury could find in favor of P-D on its Complaint, and its request for summary judgment ordering specific performance and damages is denied. Although there was no cross-motion for summary judgment by the Daniels, the Court's rulings as a matter of law essentially leave no issue left for trial and demand the entry of judgment in favor of the Daniels on P-D's Complaint.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#23] is DENIED. The Court directs that judgment as a matter of law be entered in favor of

Defendants as to Plaintiff's Complaint and that Defendants' counterclaim for breach of contract be dismissed without prejudice as premature.  This matter is now terminated.

ENTERED this 26th day of May, 2009.

                                                        s/ Michael M. Mihm  
                                                        Michael M. Mihm  
                                               United States District Judge